Joe Willie GRAYDON *v.* STATE of Arkansas

CR 97-271                                         953 S.W.2d 45

Supreme Court of Arkansas
Opinion delivered September 25, 1997

*Maxie G. Kizer*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Kelly Terry*, Asst. Att'y Gen., for appellee.

DONALD L. CORBIN, Justice. Appellant Joe Willie Graydon appeals the judgment of the Jefferson County Circuit Court convicting him of rape and second-degree battery and sentencing him to a term of life imprisonment and six years' imprisonment, respectively. Our jurisdiction of this appeal is pursuant to Ark. Sup. Ct. R. 1-2(a)(2). Appellant's sole assignment for reversal is that the trial court erred in excluding evidence of prior sexual

conduct between himself and the victim, which he offered as evidence of the victim's consent. We find no error and affirm.

The record reflects that the crimes occurred on September 4, 1995, in Pine Bluff, under a bridge on the Arkansas River. The victim, an eighteen-year-old girl, was taken to the hospital emergency room that same date and later admitted to the hospital with injuries to her face and back, consisting of bruising, swelling, lacerations, and abrasions. There was massive swelling on one side of the victim's face, such that her eyes were swollen shut, her lips were swollen, and she had blood on her head and face. The victim also sustained a broken cheek bone and a cracked bone in her sinus area. Her injuries required sutures on her right temple, above her right eye, and below her chin. Additionally, officers observed bruised areas on each side of her neck that were consistent with finger impressions.

Prior to trial, Appellant filed a motion pursuant to Ark. Code Ann. § 16-42-101 (Repl. 1994) requesting that the trial court set a hearing to determine the admissibility of evidence that he and the victim had been lovers for a period of time before the date of the alleged incident. Appellant asserted that this evidence was relevant to the issue of consent. A hearing was held, during which both Appellant and the victim testified. Appellant stated that he had been engaged in a sexual relationship with the victim, whom he referred to as "Pee Wee," for about four months prior to the time of the offense. He stated that every time they had sexual intercourse, the victim was a willing participant. He stated that they would sneak off together and that no one knew about their relationship because he was living with another woman at the time and the victim was much younger than he was. The victim, on the other hand, testified that she did not know Appellant at all until the day of the rape. She stated that she had never had sexual intercourse with Appellant. She stated further that no one calls her "Pee Wee."

Monica Hadley, the victim's sister, testified that she and her sister were living together at the time of the crime. She indicated that they were close and that her sister would talk about her boy-

friends. She stated that she had never heard her sister mention Appellant's name or that anyone called her "Pee Wee."

Wilda Chadick, a teacher at Pine Bluff High School, testified that she had been tutoring the victim after school and that she would often give the victim a ride home after the sessions. She stated that during those rides, she and the victim would talk. She also indicated that she would see the victim every day and would visit with her at ball games and other times. She stated that she had never heard of Appellant until the day of the incident and that she had never heard anyone call the victim "Pee Wee."

According to the probable-cause statement, which was admitted as an exhibit at the hearing, the victim reported the attack to police while she was in the hospital. She told the police that she had been walking home after work when a vehicle pulled up alongside her. The man in the vehicle asked her for directions to Kentucky Street. Although she knew where the street was, she did not feel that she could give proper directions, so she told the man she did not know how to get there. The man then drove away, and she continued walking. A short time later, the man pulled up alongside her again. This time the man told her that he was from out of town and needed directions to the homes of Tameka Brimmer and Felicia Jones. The man then read to her the written directions he had been given to the Jones home. He asked her if she could show him how to get there and told her he would give her a ride home if she would help him. She agreed and got into his car.

The victim told the police that the man stopped for gas along the way and that she had waited in the car. The man then drove to the north side of a bridge on the Arkansas River. When he drove up under the bridge, she repeatedly told him that he could turn around, as they were apparently not going in the right direction. The man then stopped the car and immediately grabbed her around the neck and began choking her. He put his hand between her thighs and told her not to scream because no one would hear her out there. He then pulled off her shorts and panties and performed oral sex on her. She told him several times to stop. After a short time, the man stopped performing oral sex and

asked her if it felt good. She told him that it did not feel good and put her hands between her legs. The man then started choking her again. When he stopped, he took off his pants, crawled on top of her, and began having sexual intercourse with her. When she tried to squeeze her legs shut, the man choked her again and hit her in the face. The man forced her legs open and continued having sexual intercourse again. He then climbed off her, put on his clothes, and walked around to her side and told her to get out of the car. She then dressed and got out of the car. The man then asked for a hug, which she gave him. He told her that the hug was not right and began choking her again. She told the police that she believed it was at that point she passed out and fell to the ground. When she woke up, she walked to the freeway and flagged down a passing motorist, who drove her to the hospital. She told police that she had never seen the man before that date. She was able, however, to provide a detailed description of the man and the car. Two days following the attack, the victim immediately identified Appellant as the assailant from a photographic lineup.

When Appellant was informed by the police that he was a suspect in the rape, he denied any involvement or knowledge of the battery or rape. He told police that on the date of the rape, he had had sexual intercourse with another woman under the same bridge where the attack had occurred. After further interview, however, he recanted that statement and claimed that he had had consensual intercourse with the victim, whom he referred to as "Pee Wee," under the bridge. He stated that he had initially picked up the girl at the Jiffy "J" convenience store after having received a message from her. He stated that afterwards, he had dropped her off on West 13th Street and then drove home. Appellant then changed his statement again, claiming that after he had dropped off the victim on West 13th Street, he picked her up again and they returned to the bridge and had intercourse a second time. He then stated that after they finished having sex, the victim had asked him for money and that when he refused to give her any, they began to fight. He stated that the victim kicked him in the groin area and that he struck her three to five times in the face with his fist and his elbow. He also admitted that he kicked

her in the stomach, knocking her to the ground. He stated that he then got into his car and drove away, leaving the injured girl under the bridge. He claimed that he did not rape the girl and that the two of them had engaged in sexual intercourse numerous times in the past.

Several days after the hearing, the trial court issued a written order denying Appellant's motion. The order reflected that after hearing the testimony of the witnesses and argument of counsel, it was the court's judgment that the uncorroborated evidence of prior sexual conduct between Appellant and the victim would not be admissible at trial. Appellant now contends the trial court's ruling was erroneous. We disagree.

Section 16-42-101, commonly referred to as the rape-shield statute, provides that evidence of a victim's prior sexual conduct is inadmissible at trial except where the court, at an in camera hearing, makes a written determination that such evidence is relevant to a fact in issue and that its probative value outweighs its inflammatory or prejudicial nature. *State v. Sheard*, 315 Ark. 710, 870 S.W.2d 212 (1994) (citing *Marion v. State*, 267 Ark. 345, 590 S.W.2d 288 (1979)). The purpose of the statute is to shield victims of rape or sexual abuse from the humiliation of having their personal conduct, unrelated to the charges pending, paraded before the jury and the public when such conduct is irrelevant to the defendant's guilt. *Harris v. State*, 322 Ark. 167, 907 S.W.2d 729 (1995). The trial court is vested with a great deal of discretion in ruling whether the victim's prior sexual conduct is relevant. *Id.* We will not overturn the trial court's decision unless it constituted clear error or a manifest abuse of discretion. *Id.*; *Gaines v. State*, 313 Ark. 561, 855 S.W.2d 956 (1993).

Appellant argues that the evidence of the victim's prior sexual intercourse with him was relevant to show that she consented in the present case. Prior acts of sexual conduct are not within themselves evidence of consent in a subsequent sexual act. *Sterling v. State*, 267 Ark. 208, 590 S.W.2d 254 (1979). There must be additional evidence connecting the prior acts to the consent alleged in the subsequent act before the prior acts become relevant. *Id.* Here, Appellant argues that the evidence connecting

the prior acts to the present act is the fact that the victim voluntarily got into his car on the date of the offense. We are not persuaded by this argument, which, taken to its logical conclusion, implies that the act of helping a stranger is tantamount to establishing a previous relationship between two people such that any act of sexual contact would be deemed consensual.

In light of the evidence presented at the hearing, we cannot say the trial court's decision to deny admission of the proffered evidence constituted clear error or manifest abuse of discretion. To the contrary, the only evidence presented that supports Appellant's version of events was his own self-serving testimony. There was no corroborating evidence that even linked Appellant with the victim prior to the date of the offense, let alone evidence of their having carried on a clandestine affair for several months. The primary purposes of the rape-shield statute are to protect the victim and encourage rape victims to participate in the prosecution of their attackers. *Brewer v. State*, 269 Ark. 185, 599 S.W.2d 141 (1980). Such worthy purposes would surely be thwarted if every defendant in a rape case was allowed to present uncorroborated "evidence" that he and the victim had previously engaged in sexual intercourse over the victim's denial that she had ever known her assailant before the incident. Particularly in this case, where the victim was badly beaten and injured, the minute probative value of allegations of prior consensual intercourse between the victim and the attacker are clearly outweighed by the inflammatory nature of the alleged evidence. Furthermore, Appellant failed to offer any additional evidence connecting the alleged prior acts to the consent alleged in the present incident.

In accordance with Rule 4-3(h) of the Arkansas Supreme Court Rules, the record has been reviewed for adverse rulings objected to by Appellant but not argued on appeal. No such errors were found. For the aforementioned reasons, the judgment of conviction is affirmed.